SPECIAL DEVICES, INC., Plaintiff,

v.

OEA, INC., Defendant.

OEA, Inc., Counterclaimant,

v.

Special Devices, Inc., Counterdefendant.

No. CV 99–03861 DT (SHx).

United States District Court,
C.D. California.

Jan. 16, 2001.

Robert C. Weiss, Lawrence R. LaPorte, Thomas J. Brindisi, Mary A. Tuck, Lyon & Lyon, Los Angeles, CA, for Special Devices Inc.

Neil M. Soltman, John Nadolenco, Mayer Brown & Platt, Los Angeles, CA, Paul L. Gale, Jan P. Weir, Edward F. O'Connor, Stradling Yocca Carlson & Rauth, Newport Beach, CA, Thomas P. Johnson, Kenzo S Kawanabe, Davis Graham & Stubbs, Denver, CO, for OEA, Inc.

**1172**

ORDER **GRANTING** PLAINTIFF and COUNTERDEFENDANT SPECIAL DEVICES, INC.'S MOTION FOR ATTORNEY FEES, COSTS AND EXPENSES PURSUANT TO 35 U.S.C. § 285

TEVRIZIAN, District Judge.

## I. *Background*

### A. **Factual Summary**

This action was brought by Plaintiff Special Devices, Inc. ("Special Devices") against OEA, Inc. ("OEA") for declaratory relief of patent invalidity and non-infringement under 28 U.S.C. §§ 2201 and 2202.

The following facts were found undisputed and are set forth in the Statement of Uncontroverted Facts filed on October 27, 2000:

The subject matter of United States Patent No. 5,404,263 ("the '263 Patent") is an all-glass header used in air-bag initiators, the small device that sets off, or "initiates," the explosion that results in the expansion of a vehicle's air bag.

The '263 Patent includes 24 claims. Claims 1–9 are "device" claims and each reads directly on the header shown in Figure 3 of the '263 Patent. Claim 1 is an independent claim and claims 2–9 depend directly or indirectly from claim 1 and add only minor limitations to claim 1. Claims 10–24 are "method claims" directed to the method of making an all-glass header and are not the subject of this motion.

OEA only asserted that claims 1–9 of the '263 Patent were infringed.

In 1987, OEA set out to develop a header for an air-bag initiator that it could manufacture at a reduced cost. One cost-saving measure OEA targeted was to use an "all-glass" header wherein no ceramic chip is placed at the header's top surface.

At least as early as 1990, OEA contacted Coors Ceramics, Co. ("Coors"), to see if it could manufacture the desired all-glass header in large quantities. OEA provided to Coors a drawing containing specifications for the header. Coors then created a 2/11/91 specification drawing for the OEA header based on an OEA drawing, Dwg. No. 4510415.

The header of the 2/11/91 specification drawing is identical in all material respects to the one shown in Fig. 3 of the '263 Patent.

On February 22, 1991, Coors delivered 100 pieces for OEA to test. Based on evaluation of these units, OEA decided Coors was a suitable commercial vendor, and on April 19, 1991, OEA sent Coors a proposal requesting Coors to manufacture at least 50% of OEA's commercial requirements. On May 2, 1991, Coors sent OEA a letter agreeing to the proposal.

On June 4, 1991, OEA ordered two lots from Coors, totaling 20,000 units for delivery scheduled to begin in mid to late July, 1991.

On July 10, 1991, Coors proposed the general outline for an ongoing requirements contract for millions of units per year. The proposal included a term stating that "OEA will agree to purchase from Coors Ceramics a minimum number of initiator headers or a percentage of headers required per year at prices to be agreed upon by the parties."

On July 23, 1991, OEA notified Coors that the proposed terms were acceptable, and asked Coors to prepare a formal agreement. Two years later, around July of 1993, OEA apparently stopped buying headers from Coors, and "thank[ed] Coors for providing the header assemblies during the past two years."

OEA concedes that these 1991 sales and offers for sale of the Coors headers were commercial transactions.

On August 27, 1992, OEA and Coors filed separate patent applications directed to all-glass headers and methods of making them. Both of the applications were written and prosecuted by the law firm of Sheridan & Ross, and both included drawings of an all-glass header. The OEA application became the '263 Patent and the Coors application became United States Patent No. 5,243,492 ("the '492 Patent").

The header shown in Figure 3 of the '263 Patent was the same in all material respects to the header shown in Figure 4 of the '492 Patent. These headers shown in the '263 Patent and the '492 Patent drawings were also the same as the header shown in the Coors' 2/11/91 specification drawing.

Although Sheridan & Ross was aware of the OEA/Coors commercial transactions, having attended at least one OEA/Coors meeting before filing the patents, they never informed the Patent and Trademark Office ("PTO") of the OEA/Coors commercial transaction in connection with either application.

On September 7, 1993, the '492 Patent issued with a number of narrow claims. The '263 Patent eventually issued on April 4, 1995.

Shortly after the '263 Patent issued, Coors decided that the claims of the '263 Patent covered subject matter that Coors believed it owned. Coors then obtained separate attorneys.

On September 5, 1995, Coors' new attorneys filed a reissue application based on the '492 Patent. Coors sought to obtain broader claims and provoke an interference with the '263 Patent, and to facilitate this, Coors presented six new claims copied from claims 1–3 and 10–12 of the '263 Patent. In prosecuting the reissue application, Coors' new attorneys recognized that Coors' sales and offers to OEA, the knowledge of which had been withheld from the PTO by Sheridan & Ross, were material and should have been submitted pursuant to the duty of candor. (See 37 C.F.R. § 1.56.) As part of the reissue application, the three inventors of the Coors '492 Patent told the following to the PTO under penalty of perjury:

... We do know that there were several transactions involving products having features of the invention with OEA, Inc., a corporate entity more than one year prior to the filing date of said application.... [A] transaction shown in the documents of Exhibit 2 hereto involved 2,000 products at a unit price of $10 and

18,000 products at unit prices between $3.50 and $3.25, respectively. We believe that these products were to be used for experimental purposes by OEA, Inc. We did not make the information on these transactions available in our original application, because we were not advised or aware of at that time as to what might constitute a sale under 35 U.S.C. 102(b).

Along with this declaration, Coors submitted evidence of the 1991 OEA/Coors commercial transactions to the PTO.

Coors personnel told the PTO they thought OEA used most of the 20,000 headers in "identifying sources of material, and developing written procedures and controls to insure that [Coors] was capable of making the products on a commercial basis. Coors made no restrictions on resale of the units, and even OEA's first purchase order to Coors had a 'xx' marked in a box labeled 'For resale—not subject to Colorado Retailers and Occupation tax.'"

Coors attempted to characterize the OEA/Coors commercial transactions as merely experimental, preliminary or part of a joint venture, but these arguments were all unavailing and subsequently rejected by the PTO.

On August 22, 1996, seeking to intervene or provoke an interference, OEA filed a protest to Coors' reissue application.

OEA admitted in its protest that claims 51–56 in the Coors reissue application were "identical" to claims 1–3 and 10–12 of the '263 Patent. OEA also noted claims 50 and 57 "read on the disclosure of the ['263] Patent". Coors likewise admitted that the claims corresponded. As part of its protest, OEA re-introduced and relied on most of Coors' evidence of the 1991 OEA/Coors commercial transactions.

On April 29, 1997, the PTO rejected all the claims, including the claims copied from the '263 Patent, as having been on sale under Section 102(b): "Claims 1–58 are rejected under 35 U.S.C. 102(b) based upon a public use or sale of the invention.

This is based upon applicants' own declarations and the exhibits mentioned."

Coors continued its reissue application in an attempt to obtain allowance of the claims. In late 1999, however, it abandoned the reissue, at which point the rejections still stood.

OEA's President, Charles Kafadar, stated that the April 19, 1991, letter of intent and June 4, 1991, Purchase Orders "clearly show that sample products were produced by [Coors] from an OEA drawing." Gary C. Ryser, who was OEA's Director of Engineering, Quality Control and Production, personally saw units from the lots of 20,000 headers delivered by Coors to OEA. Mr. Ryser confirms that the 20,000 Coors headers sold to OEA in 1991 were all-glass with no gaps between the insulator and eyelet, were coaxial, had two electrode pins, and stainless steel eyelets.

Around early 1997, Special Devices began developing a header it named the Advanced Glass–Seal Initiator, or "AGI."

On October 6, 1997, OEA's original patent attorney, David F. Zinger, sent a warning letter to Special Devices about the '263 Patent and asking "that the proprietary rights of OEA covered by this patent be respected." After another threat letter, counsel for Special Devices wrote back on May 22, 1998, raising a number of issues. On July 1, 1998, Mr. Zinger wrote that OEA was investigating certain inventorship issues, but never disclosed the 1991 OEA/Coors transactions. On April 9, 1999, after more communications and a final ultimatum by OEA, Special Devices filed this lawsuit. On March 21, 2000, OEA served a counterclaim alleging willful infringement.

### B. Procedural Summary

On April 9, 1999, Special Devices filed a Complaint for Declaratory Relief of Patent Invalidity and Non–Infringement with this Court.

On October 8, 1999, Special Devices filed a Response to this Court's Order to Show Cause Re Dismissal for Lack of Prosecution.[1]

On October 27, 1999, OEA filed a Stipulation to Extend Time to Answer or Otherwise Respond to the Complaint pursuant to Local Rule 3.11.1.

On February 29, 2000, this Court entered an Order Granting OEA's Request for Judicial Notice and Denying OEA's Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

On March 21, 2000, OEA filed its Answer, Affirmative Defenses, Counterclaims and Demand for Jury Trial with this Court.

On April 10, 2000, Special Devices filed its Reply to OEA's Counterclaims and Affirmative Defenses as well as a Demand for Jury Trial.

On September 13, 2000, Special Devices filed a Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 102(b). On October 12, 2000, this Court entered an Order Granting Special Devices' Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 102(b).

On September 25, 2000, OEA filed a Motion to Add Inventor and a Motion for Summary Adjudication of the Issue of Patent Infringement. However, in light of this Court's ruling on the previous Motion for Summary Judgment, these motions were ordered off calendar.

On October 18, 2000, OEA filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit.

On October 27, 2000, this Court filed the Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Partial Summary Judgment.

---

1. A copy of the file-stamped Complaint was sent to, but not served on, OEA on April 12, 1999. Subsequently, SDI served the Complaint and Summons upon OEA's attorney on October 7, 1999.

On October 30, 2000, Judgment was entered pursuant to Plaintiff's Motion for Partial Summary Judgment of Invalidity, and OEA's counterclaim was dismissed with prejudice.

On November 13, 2000, Special Devices filed a Motion for Attorney Fees, Costs and Expenses Pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927 and Local Rule 27, which is currently before this Court.

## II. DISCUSSION

### A. *OEA's Request to Strike*

■ At the outset, this Court notes OEA's argument that SDI's motion should be stricken as deliberately circumventing the Local Rules with regard to page limitations. Specifically, it objects to the Declaration of Thomas Brindisi which is 21 pages. OEA asserts that this declaration contains additional argument and is therefore an attempt by SDI to circumvent the page limitations of a memorandum. This Court finds that the striking of this motion on OEA's asserted basis is unwarranted. This Court considers arguments set forth in the memorandum of points and authorities only, and it looks to the declarations as cited in the memorandum to adequately support the facts therein.

This Court further notes that OEA objects to "SDI's attempt to use declarations to introduce facts into this motion." This Court finds that this objection is without merit. As noted above, declarations are necessary to adequately support the facts set forth in the memorandum of points and authorities.

■ OEA also objects to portions of Mr. Graves' declaration, submitted by SDI. OEA argues that Mr. Graves attempts to invalidate his own patent in violation of patent law, citing *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 252, 66 S.Ct. 101, 90 L.Ed. 47 (1945). However, as correctly noted by SDI, that case concerns the doctrine of "assignor estoppel," which

prevents an inventor or his privy, who is charged with infringement, from challenging the validity of a patent that he assigned to the patent owner. *See Scott Paper*, 326 U.S. at 252, 66 S.Ct. 101 ("As to the rest of the world, the patent may have no efficacy and create no right of monopoly, but the assignor cannot be heard to question the right of his assignee to exclude him from its use."). As such, this doctrine is inapplicable here since Mr. Graves is not charged with infringing the '263 Patent.

OEA argues next that most of Mr. Graves' declaration is based "on information and belief" and that Paragraph 14 is hearsay. This Court has taken these objections into account when relying on portions of Mr. Graves' declaration. Nonetheless, it is important to note that OEA has not submitted any evidence to refute the statements referenced in Mr. Graves' declaration. With respect to the hearsay objection, this Court overrules said objection. The challenged statement is not being offered for the truth of the matter asserted.

### B. *Analysis*

SDI requests that this Court find this case is "exceptional," warranting an award, under 35 U.S.C. § 285 ("Section 285"), of attorney fees and costs to the prevailing party, SDI, against OEA. It further requests that this Court find that OEA has multiplied the proceedings in this case unreasonably and vexatiously, warranting an award, under 28 U.S.C. § 1927 and Local Rule 27, of attorney fees, costs, and expenses incurred by SDI because of such conduct.[2]

#### 1. Standard

■ Under Section 285 of the patent statute, the prevailing party to a patent suit may recover reasonable attorney fees in exceptional cases. *See* 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the pre-

---

2. As set forth herein, this Court finds that an award of attorneys fees is warranted under Section 285. As such, this Court does not reach the determination whether an award is also proper under 28 U.S.C. § 1927 and Local Rule 27.

vailing party.") A two-step process is involved in determining whether a case is exceptional: (1) the district court must make a factual determination as to whether the case is exceptional; and (2) if the case is deemed exceptional, the district court in its discretion determines whether attorney fees should be awarded. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed.Cir.1999). Circumstances supporting a determination of exceptionality include inequitable conduct during prosecution of the patent, vexatious or bad faith litigation tactics or some other similar exceptional circumstances. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 182 F.3d 1356, 1359–61 (Fed.Cir.1999).

SDI contends that this case is "exceptional" because OEA committed inequitable conduct and engaged in bad faith and vexatious litigation.

### 2. This Court finds inequitable conduct by OEA

■ Specifically, SDI contends that OEA, by and through attorney David Zinger, committed inequitable conduct during the '263 Patent's prosecution.

As a first example of inequitable conduct, SDI offers OEA's concealment of the OEA/Coors transactions from the Patent and Trademark Office ("PTO"). As set forth in the Statement of Undisputed Facts and Conclusions of Law, although Sheridan & Ross was aware of the OEA/Coors commercial transactions, having attended at least one OEA/Coors meeting before filing the patents, they never disclosed to the PTO the OEA/Coors transactions in connection with either application. (*See* Undisputed Facts ("UF") 15.) Instead, in prosecuting the reissue application, Coors' new attorneys recognized that Coors' sales and offers to OEA—knowledge of which had been withheld from the

PTO—were material and should have been submitted pursuant to the duty of candor. (*See* UF 19.) Thus, as part of the reissue application, Coors submitted evidence of the 1991 OEA/Coors commercial transactions to the PTO. (*See* UF 20.) Nevertheless, Coors attempted to characterize the OEA/Coors transactions as merely experimental, preliminary, or part of a joint venture, but these arguments were all unavailing and rejected by the PTO. (*See* UF 22.) On April 29, 1997, the PTO rejected all the claims, including the claims copied from the '263 Patent, as having been on sale under Section 102(b). (*See* UF 27; *see also* Brindisi Decl., Exh. 7.)

In light of the foregoing, this Court agrees with SDI that the failure by OEA to inform the PTO of the OEA/Coors transactions during the '263 Patent's prosecution is inexplicable. OEA and its patent attorneys represented both OEA and Coors before the PTO and prepared both the OEA and Coors patent applications and attended at least one OEA/Coors meeting concerning the all glass header prior to filing the patent applications.

OEA argues that it was not required to disclose the prior OEA/Coors transactions since there was no case law precedent requiring such a disclosure. Specifically, it states that no case had ever held that a sale to the patentee or patentee's assignee more than a year before the filing date of the patent invalidates the patent. This Court finds OEA's argument unpersuasive.

35 U.S.C. § 102 provides as follows:

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.[3]

---

**3.** This Court made the following conclusions of law:

The 1991 OEA/Coors transactions including the proposal from OEA to Coors on April 19, 1991, the order by OEA on June 4, 1991, as well as Coors' proposal of an ongoing requirements contract on July 10, 1991, constitute

commercial offers for sale, all of which occurred prior to the critical date.
(*See* Conclusion of Law 24.)

The subject matter of claims 1–9 of the '263 patent was sold and offered for sale, and "ready for patenting" more than one year before the patent's filing. Consequently,

As SDI asserts, this statute does not include any on-sale exceptions. The case relied on by OEA in support of its position that sales to the inventor did not constitute an on sale bar, *M&R Marking Systems, Inc. v. Top Stamp, Inc.,* 926 F.Supp. 466 (D.N.J.1996), was not decided until 4 years after OEA submitted its patent application. Thus, even assuming the *M & R* case supports its position, no case at the time of OEA's application had held that such sales activities were an exception to the on-sale bar in Section 102(b).

Importantly, this Court agrees with SDI that even if OEA could justify that it thought an exception may apply to Section 102(b), it still. should have disclosed the sales transactions information to the PTO. "Each individual associated with the filing and prosecution of a patent application" is charged with the duty of candor regarding sales information. *See* 37 C.F.R. § 1.56. Indeed, the Federal Circuit has stated that there must be disclosure even in cases where issues concerning Section 102(b) are "close:"

> LaBounty argues ... that ... the issues respecting experimental use of the Adamo/Dodge and Ace shears were "close" and, therefore, Roy LaBounty and his attorney could reasonably have decided these devices did not have to be disclosed. On the contrary, that makes it all the more necessary that the devices should have been disclosed to the examiner. Close cases should be resolved by disclosure, not unilaterally by the applicant.

*LaBounty Mfg. v. USITC,* 958 F.2d 1066, 1076 (Fed.Cir.1992); *see also Paragon Podiatry Lab. v. KLM Labs.,* 984 F.2d 1182, 1193 (Fed.Cir.1993) ("As we stated in *LaBounty ...,* where the decision of whether or not to disclose sales before the critical date is close, the case should be resolved by disclosure, not by the applicant's unilateral decision.") Thus, under established principles, SDI should have disclosed the OEA/Coors commercial transactions instead of unilaterally deciding that Section 102(b)'s on-sale bar did not apply. Its failure to do so violated its duty of candor and constitutes inequitable conduct.[4]

In further support of its claim of inequitable conduct by OEA, SDI asserts that OEA misrepresented the true inventorship of the '263 Patent during the '263 Patent's prosecution. This Court finds that SDI's assertion, supported by the following evidence, has merit.

Thomas Graves, one of the two named inventors of the '263 Patent, stated in his declaration that the other named inventor of the '263 Patent, James Longwell, believed and told OEA before the OEA patent application was filed that the application disclosed "nothing novel." (*See* Brindisi Decl., ¶ 5, Exh. 4 (Graves Decl., ¶ 11.); *see also* Exh. 3.) Likewise, Mr. Graves declares that "his motivation to assist in filing the application was not a belief that the subject matter it claimed was particularly novel or inventive, at least not in sense of it having never been made before by anyone else including entities working under government sponsorship." (*See id.* at ¶ 15 of Exh. 4.) Instead, Mr. Graves was motivated by the desire of OEA's president to protect the technology and the assurances of OEA's patent attorney, Mr. Zinger, that known military prior art could be patented. (*See id.*) Further, Mr. Graves believed that Mr. Longwell informed Mr. Zinger that back in 1987, a man named Jack Watson had described to him a design for an all glass header like the one in the '263 Patent. (*See id.* at ¶ 12 of Exh. 4.) He also believed that Mr. Longwell provided Mr. Zinger three examples of engineering drawings that disclosed de-

---

claims 1–9 are invalid under 35 U.S.C. § 102(b).
(*See* Conclusions of Law 39.)

4. This Court is of the opinion that regardless of the ultimate legal determination by this Court or the Federal Circuit on appeal of, as

OEA puts it, whether a sale to an inventor, or an assignee of an inventor, constitutes an on-sale bar, OEA's failure to disclose its transactions with Coors to the PTO would still constitute inequitable conduct.

signs for all glass headers. (*See id.* at ¶ 13 of Exh. 4.) Nonetheless, OEA prosecuted the application for the '263 Patent, obtaining and submitting to the PTO the sworn declaration of Mr. Graves and Mr. Longwell that each believed he was the "original, first and joint inventor" of the claimed subject matter. (*See id.* at ¶ 6, Exh. 5.)

OEA responds that these arguments are completely inappropriate for this motion. It states that SDI is attempting to litigate issues which have never been previously litigated. This Court does not understand the significance of OEA's arguments. OEA offers no support for its contentions, and this Court is unaware of any authority which requires that an issue has to be previously litigated in order for it to be a basis for a finding of inequitable conduct. There can be no doubt that in this motion, the parties must set forth their arguments in support of their position regarding an award of attorney fees under Section 285. Based on the parties' showing, this Court makes a factual determination as to whether the case is exceptional, and if so, whether fees should be awarded. As such, based on the evidence offered in support of this motion, this Court finds that OEA's conduct with respect to inventorship is an additional basis supporting a finding of inequitable conduct.

### 3. This Court finds bad faith litigation by OEA

In further support of its claim that this case is exceptional warranting attorneys fees, SDI contends that OEA engaged in vexatious and bad faith tactics both before and throughout this litigation. This Court briefly examines each of these "tactics" alleged by SDI.

#### a. Threats of litigation

SDI contends that OEA threatened SDI with litigation in bad faith, asserting a patent OEA knew to be invalid and unenforceable in order to place a cloud over SDI's products in the marketplace and to force SDI to incur unnecessary expenses. It states that on October 6, 1997, two years after Coors initiated the Coors reissue proceedings, more than a year after OEA filed its reissue Protest, and months after the PTO had rejected the reissue claims, OEA, through counsel Mr. Zinger, commenced patent infringement litigation threats against SDI. (*See* Brindisi Decl., Exhs. 8–13.)

While SDI refers to the pre-litigation letters by OEA as "threats," this Court finds that the transmission of such pre-litigation notice letters alone does not constitute bad faith. However, in this case, this Court does find it significant that never during this period of time did OEA ever reveal to SDI the existence of the OEA/Coors transactions or the prosecution of the Coors' reissue application or the PTO rejections of claims identical to the '263 Patent. Indeed, this Court finds that throughout this litigation, OEA continued with its less than candid behavior regarding the OEA/Coors commercial transactions that it initially demonstrated with the PTO.

#### b. OEA's motion to dismiss

SDI contends that OEA's motion to dismiss was brought in bad faith by falsely representing to the Court that OEA had never threatened SDI with litigation. While this Court ultimately rejected OEA's contentions and denied OEA's motions, this Court declines to find that OEA's motion was necessarily brought in bad faith.

#### c. OEA's counterclaim

SDI argues that OEA countersued in bad faith for willful infringement even though it knew that the '263 Patent was invalid and unenforceable. Again, the filing of OEA's counterclaim alone does not constitute bad faith. Rather, it is the fact that OEA was less than forthcoming about the OEA/Coors transactions and the PTO rejections of the claims during the prosecution of its counterclaim which evidences bad faith.

#### d. Discovery

SDI asserts that OEA willfully withheld from SDI highly material, discoverable in-

formation during discovery and that its discovery responses were incomplete and replete with baseless objections. While SDI sets forth its list of discovery problems with OEA, this Court finds that OEA's failure to produce documents pertaining to the on-sale bar issue, in particular, evidences bad faith. The only documents that OEA produced from the Coors reissue file history was OEA's self-serving Protest. (*See* Brindisi Decl., ¶ 32.) OEA did not produce the Coors reissue declaration and the PTO's Office Action rejecting all claims copied from the '263 Patent as on-sale and invalidated by the Little and Lee patents, even though these documents were responsive to SDI's document requests. (*See id.* at Exh. 14.) OEA also did not produce its Supplemental Protest and Exhibit D that OEA submitted in the Coors reissue proceedings but which were returned to OEA by the PTO. (*See id.* at ¶ 34 and Exh. 19.) SDI only learned of the critical Coors reissue documents (which invalidated the '263 Patent in the motion for summary judgment) by independently obtaining the information from other sources. (*See id.* at ¶ 35.)

OEA responds summarily that "documents concerning the Coors reissue, which were in OEA's possession, were produced to SDI" and that "the entire reissue file was a matter of public record." OEA appears to justify its failure to respond to discovery requests on the basis that SDI obtained these documents anyway and that these documents were part of a public record. OEA completely misses the point. SDI could not know to search public records if it had no idea what it was searching for. More importantly, OEA cannot just completely ignore valid discovery requests on the basis that the party can obtain the discovery elsewhere. Indeed, the very purpose of discovery is to obtain all information relevant to the claims at issue. Contrary to OEA's arguments, its failure to produce these documents is not just a matter of being slow to respond to discov-

ery requests or not responding because a court determines it unnecessary or privileged, as in the case relied upon by OEA.[5] Rather, OEA's failure to produce these responsive and highly relevant documents was bad faith. In fact, OEA's excuses for its failure to produce these documents weakens its assertions that it reasonably believed that the OEA/Coors transactions were an exception to the on-sale bar.

### e. Other litigation

SDI further contends that OEA brought motions solely to multiply the proceedings in bad faith. It first argues that OEA's summary judgment opposition was advanced in bad faith, requiring SDI to file a reply. This Court disagrees. OEA was required to respond to SDI's motion; indeed, it would have been grossly negligent if it failed to litigate its position in opposition to a pending motion. Next, SDI argues that OEA filed a motion for summary adjudication of infringement which was wholly redundant and a motion to add inventor which should never have been filed. It asserts that OEA's refusal to put these motions off calendar until a ruling on SDI's motion for summary judgment caused SDI to bear the expense and effort of preparing ultimately unnecessary oppositions. While these motions were ultimately moot, this Court declines to find that the filing of these motions alone constitutes bad faith. Instead, these motions can be viewed as the active prosecution of OEA's counterclaim.

### C. *An Award of Attorney Fees is Warranted*

In sum, this Court finds inequitable conduct and bad faith litigation tactics by OEA which makes this case an exceptional case under 35 U.S.C. § 285. In a case cited to by SDI, *Mathis v. Spears*, 857 F.2d 749, 751–52 (Fed.Cir.1988), the Federal Circuit upheld an award of attorney fees under Section 285 for conduct similar to OEA's here. *See Mathis*, 857 F.2d at

---

**5.** Similarly, OEA's arguments that the documents were withheld because they were privi- leged is belied by the fact that no privilege log was ever produced.

**1180**

751–52. As the *Mathis* Court stated in explaining the district court's award:

> Citing Mathis' inequitable conduct before the Patent and Trademark Office (PTO), its discovery abuses, its continuation of the suits on the utility patents when aware of prior art that "clearly rendered them invalid," and its misleading "simulation" at trial of a prior art device, . . ., the district court said Mathis' "course of conduct demonstrates a recklessness with regard to the truth, which justifies an award of attorneys' fees under the 'exceptional case' provision of 35 U.S.C. § 285".

*Id.* at 751. Thus, this Court finds that reasonable attorney fees, costs and expenses should be awarded to SDI.

## III. CONCLUSION

Accordingly, this Court **grants** Plaintiff/Counterdefendant Special Devices, Inc.'s Motion for Attorney Fees, Costs and Expenses Pursuant to 35 U.S.C. § 285. This Court is not able to determine the amount of the award since no evidence is presently before this Court. Consequently, upon a properly noticed motion, this Court will fix the amount of attorney fees based upon the applicant's documentation and the parties' briefing thereto. Under this Court's "inherent equitable power and informed discretion," this Court will then determine the compensatory amount of the award in light of the offender's conduct. *See Mathis,* 857 F.2d at 754. Finally, it is worth noting that this Court is mindful of Section 285's requirement that the fees awarded be "reasonable" and that this requirement "is a safeguard against excessive reimbursement." *See Mathis,* 857 F.2d at 754.

IT IS SO ORDERED.

**ORDER GRANTING SPECIAL DEVICES' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES PURSUANT TO 35 U.S.C. § 285, 28 U.S.C. § 1927, AND LOCAL RULE 27A**

Having considered the briefings of the parties concerning Special Devices' Motion for Attorneys' Fees Costs, And Expenses Pursuant To 35 U.S.C. § 285, 28 U.S.C. § 1927, And Local Rule 27,

It is hereby ORDERED that:

(1) Special Devices' Motion is GRANTED;

(2) Counsel for Special Devices is instructed to prepare and file with the Court a statement detailing the fees and costs it seeks.