**SPECIAL DEVICES, INC.,**
**Plaintiff–Appellee,**

v.

**OEA, INC., Defendant–Appellant.**

**Nos. 01–1053, 01–1078.**

United States Court of Appeals,
Federal Circuit.

DECIDED: Oct. 26, 2001.

Robert M. Taylor, Jr., Lyon & Lyon, LLP, of Irvine, CA, argued for plaintiff-appellee. On the brief was Robert C. Weiss, Lyon & Lyon, LLP, of Los Angeles, CA. Of counsel was Thomas J. Brindisi, of Los Angeles, CA.

Edward F. O'Connor, Stradling Yocca Carlson & Rauth, of Newport Beach, CA.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LOURIE, Circuit Judge.

MICHEL, Circuit Judge.

OEA, Inc. appeals from a summary judgment by the United States District Court for the Central District of California

holding OEA's U.S. Patent No. 5,404,263 invalid because OEA had contracted with a supplier to have the patent's commercial embodiment mass-produced more than one year before it filed a patent application, thereby invoking the on-sale bar under 35 U.S.C. § 102(b). *See Special Devices, Inc. v. OEA, Inc.*, 117 F.Supp.2d 989, 995–96 (C.D.Cal.2000). OEA now invites us to create an exception to the on-sale bar, one that would allow inventors to stockpile commercial embodiments of their patented invention via commercial contracts with suppliers more than a year before they file their patent application.

Because neither the text of section 102(b) nor the precedent interpreting it permits this proposed exception, and because the primary purpose of the on-sale bar is to promote prompt patent filings, we decline OEA's invitation and affirm the district court's judgment.

### Background

OEA owns by assignment U.S. Patent No. 5,404,263 (the "'263 patent"), which issued from an application filed on August 27, 1992. More than a year earlier, however, OEA began negotiating with a supplier, the Coors Ceramics, Co., which (unlike OEA) had the capacity to mass-produce OEA's invention—an "all-glass header" relating to automobile air bags.

In April 1991, OEA sent Coors a proposal requesting that Coors manufacture at least half of OEA's needs for the commercial embodiment of the prospective '263 patent. In May 1991, Coors accepted. In June 1991, OEA ordered 20,000 units of the claimed invention for delivery beginning in July 1991. That July, Coors also outlined the general terms for a requirements contract that would annually supply OEA with millions of units of its own invention. OEA agreed to those terms later that month and asked Coors to prepare a formal agreement.

During the subsequent prosecution of the application that matured into the '263 patent, OEA did not disclose these commercial sales and offers for sale to the Patent and Trademark Office. The PTO, however, later learned about these sales from Coors itself, which was initially using the same attorneys as OEA to prosecute a related patent. In 1995, after OEA's and Coors' respective patents had issued, Coors obtained new attorneys to prosecute a reissue application for its patent, and those new attorneys informed the PTO (via the inventors' affidavits) about the 1991 commercial transactions with the Defendant Appellant OEA. Citing the on-sale bar, 35 U.S.C. § 102(b), the PTO rejected all of Coors' reissue application claims in 1997, including the claims that relate to OEA's patented product.

In 1999, after receiving threat letters from OEA, Plaintiff–Appellee Special Devices, Inc. sued OEA and requested a declaratory judgment that claims 1—9 of the '263 patent were invalid and not infringed. OEA counterclaimed for infringement of those same claims. On October 10, 2000, the district court granted partial summary judgment, holding that the on-sale bar rendered all asserted claims of the '263 patent invalid. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### Discussion

We review a grant of summary judgment *de novo*. *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1450, 44 USPQ2d 1037, 1039 (Fed.Cir. 1997). As the Supreme Court has held, the on-sale bar under 35 U.S.C. § 102(b) applies when (1) the invention at issue had become the "subject of a commercial offer for sale" more than one year before the filing of the patent application; and (2) the invention was ready for patenting, either by, for example, having that invention re-

duced to practice or by preparing "drawings or other descriptions of the invention" that would enable one skilled in the art to practice the invention. *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A "sale" under this bar occurs when the parties offer or agree to reach " 'a contract ... to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.' " *Zacharin v. United States,* 213 F.3d 1366, 1370, 55 USPQ2d 1047, 1050 (Fed.Cir.2000) (quoting *In re Caveney,* 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir. 1985)).

Here, OEA does not contest that its April 1991 proposal to Coors, its June 1991 order for 20,000 commercial units of its invention, and Coors' and OEA's July 1991 agreement to a requirements contract each constituted an offer to sell for purposes of section 102(b). (*See generally* Appellant's Br. at 5–10.) In addition, OEA has conceded that these transactions were "commercial," not experimental. (*E.g.,* Appellant's Reply Br. at 3; J.A. 053.) And OEA appears to have never argued that the product sold or offered for sale—OEA's "all-glass header"—had not yet become ready for patenting. (*See, e.g.,* Appellant's Reply Br. at 3; J.A. 063, ¶ 32.) OEA's infringement counterclaim cannot withstand application of the on-sale bar, therefore, because the '263 patent had indeed become the subject of a commercial sale or offer to sell more than one year before OEA filed its patent application.

That would ordinarily end the two-part analysis under section 102(b). But OEA asks that we now recognize a "supplier" exception to the on-sale bar, arguing that we have never expressly applied the bar to a patentee-supplier relationship and that our precedent therefore permits such an exception. (*See* Appellant's Br. at 5–9.) We disagree, as neither the statutory text,

nor precedent nor the primary purpose of the on-sale bar allows us to grant OEA's request.

First, the text of section 102(b) itself makes no room for a "supplier" exception, stating only that a "person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." By phrasing the statutory bar in the passive voice, Congress indicated that it does not matter who places the invention "on sale"; it only matters that someone—inventor, supplier or other third party—placed it on sale. *See* 35 U.S.C. § 102(b); *see also Zacharin,* 213 F.3d at 1371, 55 USPQ2d at 1051 ("[U]nder this court's precedents, it is of no consequence that the sale was made by a third party, not by the inventor. . . .").

Consistent with this rationale, we have previously held that even if a thief "stole" the claimed invention and passed it on to an innocent buyer, the innocent buyer's subsequent offer to sell still triggered the plain language of the on-sale bar. *See Evans Cooling Sys., Inc.,* 125 F.3d at 1453–54, 44 USPQ2d at 1042 ("[W]e decline to create the suggested new exception to the 102(b) bar which has no basis in the language of the statute."). Further, we explained that patentees could still protect themselves in these circumstances by taking " 'prompt action' " and filing a patent application within the one-year deadline. *Id.* at 1453 (quoting *Lorenz v. Colgate–Palmolive–Peet Co.,* 167 F.2d 423, 429–30 (3d Cir.1948)). Here, OEA could have protected itself in the same manner, as its contractual relationship with Coors certainly provided no obstacle to a timely patent application filing. *See id.; see also Caveney,* 761 F.2d at 676, 226 USPQ at 4 ("The mere fact that a product is delivered to a distributor does not exempt the transaction from 35 U.S.C. § 102(b).").

The precedent cited by OEA does not support, much less compel, a contrary conclusion. In *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corporation*, for example, we reiterated that the offer to sell under section 102(b) must take place " 'between two separate entities.' " 182 F.3d 888, 890, 51 USPQ2d 1470, 1472 (Fed.Cir.1999) (quoting *Caveney*, 761 F.2d at 676, 226 USPQ at 4). Applying that premise, we rejected arguments similar to those made by OEA here, even though the *Brasseler* buyer and seller each employed the invention's various inventors, the buyer had initiated the development of the invention and the seller agreed to manufacture the invention "solely" for the buyer. *See id.* at 889–90, 51 USPQ2d at 1471–72. These facts, we said, still showed "nothing about the basic corporate relationships" between the *Brasseler* buyer and seller. 182 F.3d at 890, 51 USPQ2d at 1472. Indeed, we emphasized that we previously had "held entities separate for purposes of § 102(b) in cases" with "much more overlap between the buyer and seller" than the overlap between the *Brasseler* buyer and seller. *Id.*

OEA, by comparison, has even less overlap with its seller, Coors, than did the buyer and seller in *Brasseler*. OEA does not assert that it shared inventors or developmental efforts with Coors or that Coors would serve as the sole supplier of OEA's "all-glass header" needs. *See id.* Moreover, we do not see how either the facts present or the reasoning used in *Brasseler* counsels in favor of a "supplier exception" to the on-sale bar. Indeed, given that decision's focus on whether the buyer and seller constituted two distinct entities—as with a patentee and its supplier—we think *Brasseler* plainly disfavors the exception now sought by OEA.

Nor can OEA overcome section 102(b) by seizing on hypothetical and other language used in *Brasseler*. In the course of rejecting Brasseler's on-sale bar arguments, we noted that:

> By way of the sale to Brasseler, these inventors [who owned the manufacturer that sold the invention at issue] commercially exploited the invention prior to the critical [filing] date.
>
> This is not a case in which an individual inventor takes a design to a fabricator and pays the fabricator for its services in fabricating a few sample products. Here [the seller] made a large number of the agreed-upon product for general marketing by Brasseler. The transaction was invoiced as a sale of product, and the parties understood the transaction to be such.

*Id.* at 891, 51 USPQ2d at 1473. At oral argument and in its brief, OEA intimated that it falls outside the realm of the analysis and the hypothetical described above, since its supply contracts with Coors did not involve the "commercial exploitation" of the '263 patent. (*See* Appellant's Br. at 7–8.) But the language used in *Brasseler* does not salvage OEA's theory; as noted earlier, OEA ordered 20,000 units from Coors in June 1991 and thereafter agreed to a requirements contract for millions of units each year, far more than the "few sample products" mentioned in the *Brasseler* hypothetical. *See* 182 F.3d at 891, 51 USPQ2d at 1473.

And again, OEA has admitted that these transactions with Coors were "commercial," not experimental. (Appellant's Reply Br. at 3; J.A. 053.) Given the sheer number of units purchased, as well as the unrebutted finding that OEA had purchased them for commercial purposes, we conclude that the invention was commercially exploited before the critical filing date.

OEA's additional discussion of *Zacharin, supra,* is similarly unavailing. There, we addressed whether a developmental con-

tract with the government constituted a "commercial" sale for purposes of the on-sale bar, a question that we answered in the affirmative. *Zacharin,* 213 F.3d at 1370, 55 USPQ2d at 1050. Again, however, OEA already conceded that these sales were "commercial" before the district court, and it does not now attempt to revive the point with us. (*E.g.,* Appellant's Reply Br. at 3.) And besides, nothing in *Zacharin,* in either its analysis or its dicta, reasonably supports a judicially created "supplier" exception to the on-sale bar.

We also have previously expressed little interest in the reasoning used by the district court in *M & R Marking Sys., Inc. v. Top Stamp, Inc.,* 926 F.Supp. 466 (D.N.J. 1996) and now relied upon by OEA. Specifically, we noted in *Brasseler* that we had "no obligation to follow the district court's reasoning" in that case, though we went on to distinguish its facts from the facts in *Brasseler.* 182 F.3d at 891, 51 USPQ2d at 1473. In any event, *M & R Marking* involved the sale of a plaintiff's patented inventions to the defendant's "exclusive [U.S.] distributor of ... stamp mount products" more than a year before the inventions' patent filing date. 926 F.Supp. at 468–69. Rejecting the on-sale analysis at the preliminary injunction stage, the district court applied the now-abandoned "totality-of-the-circumstances" test for section 102(b) and ruled the on-sale bar inapplicable "to a sale from a manufacturer to the inventor." *Id.* at 470–71.

Though factually on point, *M & R Marking* still provides no compulsion for us to follow it, for again the opinion came from the district court and, more significantly, the Supreme Court has disavowed the "totality-of-the-circumstances" test used in that case, *see Pfaff,* 525 U.S. at 66, n. 11, 119 S.Ct. 304. As a result, of course, none of the precedents cited in *M & R Marking* analyzed the on-sale bar in light of the new on-sale regime imposed by *Pfaff* and its

progeny. Because we have analyzed the new test for the on-sale bar, both in *Brasseler, supra,* and in this case, and because neither statutory text nor precedent supports the *M & R Marking* analysis, we now expressly reject that reasoning and hold that no "supplier" exception exists for the on-sale bar. If such an exception is to be created, Congress, not this court, must create it.

■ Last, our holding here comports with the primary policy of the on-sale bar; namely, the policy of "encourag[ing] an inventor to enter the patent system promptly." *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1370, 47 USPQ2d 1363, 1365 (Fed.Cir.1998) ("Section 102(b) ... is primarily concerned with the policy that encourages an inventor to enter the patent system promptly ...."); *see also Caveney,* 761 F.2d at 676, 226 USPQ at 4 (noting that the on-sale bar promotes, among other things, the "prompt and widespread disclosure of inventions to the public"). Relying on this policy, we stated in *Woodland Trust* that the on-sale bar would apply even if a patentee's commercial activities took place in secret. 148 F.3d at 1370, 47 USPQ2d at 1365–66 ("Thus an inventor's own prior commercial use, albeit kept secret, may constitute a ... sale under § 102(b), barring him from obtaining a patent"). We see no reason why sales for the purpose of the commercial stockpiling of an invention, even if they took place in secret, should merit different treatment.

### Conclusion

The on-sale bar applies here and thereby invalidates claims 1—9 of the '263 patent because that patented invention became the subject of three commercial sales more than one year before the filing of its patent application and because OEA and its supplier Coors did not "overlap" and

constitute the same entity for on-sale bar purposes. In addition, OEA has cited no statutory text, persuasive precedent or compelling statutory purpose that would justify the creation of a "supplier" exception to the on-sale bar. For these reasons, the partial summary judgment granted by the district court is

*AFFIRMED.*