# United States Court of Appeals for the Federal Circuit

---

**HAMILTON BEACH BRANDS, INC.,**
*Plaintiff-Appellant,*

v.

**SUNBEAM PRODUCTS, INC. (doing business as Jarden Consumer Solutions),**
*Defendant-Appellee.*

---

2012-1581

---

Appeal from the United States District Court for the Eastern District of Virginia, Case No. 11-CV-0345, Judge James R. Spencer.

---

Decided: August 14, 2013

---

ROBERT M. TYLER, McGuire Woods LLP, of Richmond, Virginia, argued for plaintiff-appellant. With him on the brief were KRISTEN M. CALLEJA and WILLIAM N. FEDERSPIEL.

RICHARD D. HARRIS, Greenberg Traurig, LLP, of Chicago, Illinois, argued for defendant-appellee. With him on the brief were KEVIN J. O'SHEA and MATTHEW J.

LEVINSTEIN.    Of counsel on the brief was KIMBERLY WARSHAWSKY, of Phoenix, Arizona.

———————————————

Before O'MALLEY, BRYSON, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Dissenting opinion filed by *Circuit Judge* REYNA.

O'MALLEY, *Circuit Judge.*

Hamilton Beach Brands, Inc. ("Hamilton Beach") appeals from the decision of the United States District Court for the Eastern District of Virginia granting in part Sunbeam Products, Inc.'s ("Sunbeam") motion for summary judgment finding claims 1 and 3–7 ("asserted claims") of U.S. Patent No. 7,947,928 ("the '928 patent") invalid as anticipated. The district court also found that Sunbeam did not literally infringe the asserted claims of the '928 patent. Hamilton Beach's appeal is timely, and we have jurisdiction under 28 U.S.C. § 1295(a)(1). For the reasons below, we *affirm* the district court's ruling that the asserted claims are invalid under the on-sale bar.

## I. BACKGROUND

Hamilton Beach and Sunbeam are direct competitors in the small kitchen appliance industry. Both Hamilton Beach and Sunbeam sell competing versions of "slow cookers," which are electrically heated lidded pots that are used to cook food at low temperatures for long periods. *See* New Oxford English Dictionary (3d ed. 2010) ("slow cooker, n. a large electric pot used for cooking food"). Hamilton Beach is the assignee of the '928 patent, which is directed to a particular type of portable slow cooker.

The '928 patent, filed June 4, 2010, is a continuation of U.S. Patent Application No. 12/255,188, which, in turn, is a continuation of U.S. Patent Application No. 11/365,222 ("the '222 application"). The '222 application

was filed on March 1, 2006 and issued on February 3, 2009, as U.S. Patent No. 7,485,831 ("the '831 patent"). In other words, the '928 patent directly at issue in this case is the "grandchild" of the '831 patent. The '831 patent disclosed a "portable" slow cooker. The claimed slow cooker included clips used to seal the detachable lid of the device on the housing of the cooker. The sealing action provided by the clips is intended to limit leaking during transport. *See* '831 patent, col. 1, ll. 16–34. The '831 patent provides an image of a preferred embodiment:



*Fig. 2*

'831 patent, col. 2, ll. 29–34. The written description provides that at least one "clip" (element 22) is used, among other elements, to seal the lid onto the body of the slow cooker. *Id.*, col. 5, ll. 13–46.

Hamilton Beach's commercial embodiment of its patented invention is the Stay or Go® slow cooker. According to Hamilton Beach, the Stay or Go® slow cooker was a tremendous commercial success and increased Hamilton Beach's market share by over 30 percent. In response to Hamilton Beach's success, Sunbeam, the previous market

leader, developed a competing slow cooker called the Cook & Carry®. Sunbeam attempted to design around the '831 patent claims by mounting sealing clips on the lid of the slow cooker rather than on the body.

Hamilton Beach responded to Sunbeam's introduction of its slow cooker by filing a continuation of the '222 application, which eventually matured into the '928 patent. As could be predicted, the '928 patent claimed a slow cooker with sealing clips on the lid of the slow cooker. *See* '928 patent, col. 8, ll. 34–49. During prosecution of the '928 patent, Hamilton Beach argued that a person of ordinary skill in the art would recognize that placing the clips on the lid was wholly consistent with the original disclosure in the '222 application. The patent office agreed, and the '928 patent issued on May 24, 2011. That same day, Hamilton Beach filed suit alleging that Sunbeam's Cook & Carry® slow cooker infringed the '928 patent. *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 3:11-cv-00345-JRS, ECF No. 1 (E.D. Va. May 24, 2011).

Hamilton Beach alleged that Sunbeam's Cook & Carry® slow cooker infringed claims 1 and 3–7 of the '928 patent ("asserted claims"). Claim 1 is representative and provides:

> 1. A slow cooker for heating of food stuffs, the slow cooker comprising:
>
> a housing having a base and a side wall extending therefrom to define a heating cavity within the housing, the housing further having a housing rim at a first, free edge of the side wall defining an opening to the heating cavity;
>
> a heating element disposed within the housing sufficiently proximate the heating cavity to heat the heating cavity;

a container having a generally hollow interior and a container rim defining an opening for accessing the interior thereof, the interior being capable of retaining the food stuffs therein, the container being shaped and sized to fit within the heating cavity of the housing for heating thereof by the heating element;

a lid sized and shaped to at least partially cover the opening of the container when placed on the container rim, the lid having a gasket around an outer edge thereof for sealing engagement with the container rim; and

at least one clip mounted between the lid and the side wall of the housing, the at least one clip being an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing, the at least one clip being selectively engageable with the lid and side wall of the housing to selectively retain the lid in sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container, wherein the housing and lid have a vertical height, the at least one clip being disposed entirely within the vertical height of the housing and lid to facilitate storage and transport of the slow cooker when the at least one clip is engaged with the lid and side wall of the housing.

'928 patent, col. 8, ll. 16–49.

Two days after filing suit, Hamilton Beach moved for a preliminary injunction, which the district court denied. *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 3:11-cv-00345-JRS, ECF No. 58 (E.D. Va. Aug. 15, 2011). A few months later, the district court construed a number

of claim terms and then entertained the parties' motions for summary judgment. *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 3:11-cv-00345-JRS, ECF No. 79 (E.D. Va. Dec. 20, 2011).

Sunbeam moved the court for summary judgment, contending that its Cook & Carry® slow cooker did not infringe the asserted claims. Sunbeam also argued that the asserted claims of the '928 patent were invalid because Hamilton Beach could not claim priority to the '831 patent as it introduced new matter into the '928 written description, which rendered the '928 patent's claims anticipated under 35 U.S.C. § 102(a) and (b). Sunbeam further claimed that Hamilton Beach offered for sale and publicly used the Stay or Go® slow cooker, the commercial embodiment of the '831 patent, more than one year prior to the earliest possible filing date, i.e., one year prior to the '831 patent's application date—March 1, 2006 (the '831 patent's application date and the earliest possible filing date), rendering the '928 patent claims invalid. Sunbeam last contended that the '928 patent claims were invalid as obvious. Hamilton Beach moved the court for a finding that the '928 patent claims were not invalid on the ground that no new matter was added.

The district court granted Sunbeam's motion, finding that the Cook & Carry® slow cooker did not infringe the asserted claims of the '928 patent. *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 3:11-cv-00345-JRS, ECF No. 200 (E.D. Va. July 13, 2012). The district court also concluded that the '928 patent was invalid because it was not entitled to an earlier filing date than the one listed on its face because Hamilton Beach added new matter when it filed its continuation; therefore, the sales of the Stay or Go® slow cooker more than one year before that date served as invalidating sales and uses of the '928 patent under the on-sale and public use bars of 35 U.S.C.

§ 102(b)[1]. *Id.* And, the district court found that, even if the '928 patent was entitled to an earlier priority date coincident with the '222 application, there were invalidating commercial offers to sell the Stay or Go® slow cooker prior to the critical date. *Id.* The district court, however, determined that Sunbeam did not establish its public use defense with respect to the '222 application date or that the patent was obvious. *Id.* Hamilton Beach then filed this appeal.

## II. DISCUSSION

The district court found that Hamilton Beach's purchase order with its foreign supplier for the Stay or Go® amounted to an invalidating commercial offer for sale under the on-sale bar of 35 U.S.C. § 102(b). We agree with the district court that Hamilton Beach's transaction with its foreign supplier in early 2005 was an offer for sale of a product that anticipated the asserted claims and that the invention was ready for patenting prior to the critical date. As discussed below, therefore, we hold the asserted claims of the '928 patent invalid under § 102(b). Consequently, we find the remaining issues on appeal moot.

## A. LEGAL STANDARD

We apply the law of the regional circuit when reviewing summary judgment decisions. *Brilliant Instruments, Inc., v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (citing *Lexion Med., LLC v. Northgate Techs., LLC, Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011)). The Fourth

---

[1] Congress recently changed the language and structure of 35 U.S.C. § 102. *See* Leahy-Smith America Invents Act, PUB. L. NO. 112-29. Because this case was filed before the effective date of the change, we refer to the old version of § 102(b).

Circuit reviews the grant of summary judgment de novo. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). "The district court should only grant a motion for summary judgment where there is no genuine dispute as to an issue of material fact, and the moving party is entitled to summary judgment as a matter of law." *Id.* (citing *Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir. 1995)).

The on-sale bar applies when two conditions are satisfied before the critical date: (1) the claimed invention must be the subject of a commercial offer for sale; and (2) the invention must be ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). An actual sale is not required for the activity to be an invalidating commercial offer for sale. *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008). An attempt to sell is sufficient so long as it is "sufficiently definite that another party could make a binding contract by simple acceptance." *Id.* (citing *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed. Cir. 2002)). "In determining such definiteness, we review the language of the proposal in accordance with the principles of general contract law." *Id.*

An invention is "ready for patenting" when prior to the critical date: (1) the invention is reduced to practice; or (2) the invention is depicted in drawings or described in writings of sufficient nature to enable a person of ordinary skill in the art to practice the invention. *Id.* The on-sale bar is a question of law based on underlying factual findings. *See Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045–46 (Fed. Cir. 2001); *see also Leader Technologies, Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012) ("Whether a patent is invalid for a public use or sale is a question of law, reviewed de novo, based on underlying facts, reviewed for substantial evidence following a jury verdict."); *Electromotive Division of General Motors Corp. v. Transportation Systems Division of General Electric Co.*, 417 F.3d 1203, 1209-10 (Fed. Cir.

2005) ("Whether an invention was on sale within the meaning of § 102(b) is a question of law that we review de novo based upon underlying facts, which we review for clear error.").

## B. ANALYSIS

Sunbeam contended that Hamilton Beach's foreign supplier offered to sell the Stay or Go® slow cooker, a commercial embodiment of the '831 and '928 patents, to Hamilton Beach prior to the relevant critical date of March 1, 2005. The district court agreed and found that the claimed invention in the '831 and '928 patents was offered for sale and was ready for patenting before the critical date.

At the outset, there are three important points to note. First, while the trial court found that the relevant critical date for the '928 patent was June 4, 2009, because the patent included new matter—a finding which would clearly invalidate that patent under § 102(b)—it alternatively found that the on-sale bar applied even if the '928 patent was entitled to the '831 patent's critical date, i.e., March 1, 2005. Because we do not address the trial court's new matter finding, we employ the earlier critical date in our § 102(b) analysis, a date more favorable to Hamilton Beach. Second, there is no "supplier exception" to the on-sale bar. *See Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1355 (Fed. Cir. 2001). Thus, it is of no consequence that the "commercial offer for sale" at issue in this case was made by Hamilton Beach's own supplier and was made to Hamilton Beach itself. Finally, a commercial offer for sale made by a foreign entity that is directed to a United States customer at its place of business in the United States may serve as an invaliding activity. *In re Caveney*, 761 F.2d 671, 676–77 (Fed. Cir. 1985). It is undisputed that Hamilton's Beach's foreign supplier directed its activity to Hamilton Beach within the United States.

### 1. COMMERCIAL OFFER FOR SALE

The district court found that Hamilton Beach's interaction with its supplier was dispositive regarding whether the patented invention was the subject of a commercial offer for sale. We agree, albeit on slightly different grounds.

On February 8, 2005, Hamilton Beach issued a purchase order to its supplier for manufacture of its Stay or Go® slow cookers. Hamilton Beach listed on the purchase order its facility in Tennessee as the shipping address and its office in Virginia as the billing address. Hamilton Beach also listed the specific quantity—almost 2000 units, part number, unit price, and requested delivery date for the slow cookers. On February 25, 2005, the supplier, via email, confirmed that it had received the purchase order and noted that it would begin production of the slow cookers after receiving Hamilton Beach's release.

As noted by the district court, in the small kitchen appliance industry, such a purchase order is a typical transaction. The transaction involves a manufacturer transmitting a purchase order to a vendor or supplier, with the supplier fulfilling that order by manufacturing the requested items. In that scenario, the manufacturer makes the initial contact, which is an offer to *buy*. The district court, relying on *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1052 (Fed. Cir. 2001), found that an offer to buy a patented invention prior to the critical date amounts to an invalidating sale under § 102(b) as long as the offer is accepted and a binding contract to sell is formed. *Id.* at 1052.

In *Linear Tech*, Linear Technology Corporation ("LTC") created the LT1070 chip, which was "a functioning version of the [claimed] invention." *Id.* at 1043–44. Prior to the critical date and release of the chip, LTC's European distributors submitted purchase orders, or

offers to buy, the LT1070. *Id.* at 1044–45, 1052. Upon receipt of these offers to buy, LTC would create dummy accounts in its sales software until the chip was ready for release, but did not otherwise respond to the buyers' offers. *Id.* Once the chip was officially released, LTC customer service representatives would convert the dummy orders into normal orders which it would then accept. *Id.* The buyers were never required to take any action beyond their initial offers to buy. *Id.*

Based on those facts, this court stated that "[t]he question is whether LTC accepted [the foreign distributors' offers to buy] before [the critical date], because if so, then it entered into a binding contract to sell the LT1070 that invalidates the [patent-in-suit]." This court found that, because LTC never communicated acceptance of the distributors' offers to buy prior to the critical date, there was no completed sale, and, thus, no invalidating sale. *Id.* at 1052–1054.

Relying on *Linear Tech*, the district court in this case stated that, if the transactions and communications between Hamilton Beach and its supplier formed a *binding contract, Pfaff's* first prong would be met. The district court then analyzed the communications between Hamilton Beach and its supplier and found that the supplier's response email in February 2005—prior to the March 1, 2005 critical date—was an objective manifestation of assent that created a binding contract between the parties for sale of the patented product. The parties spend much of their briefing on appeal debating the propriety of this conclusion. While the district court's conclusion that the claims of the '928 patent are invalid under § 102(b) was correct, there was no need for the district court to require a binding contract on these facts; *Linear Tech* is factually distinguishable, making the lower court's and parties' reliance on it misplaced.

After Hamilton Beach sent the February 8, 2005, purchase order to its supplier, the supplier responded that it had received the order *and was ready to fulfill it* upon Hamilton Beach's "release." The email also listed specific details of what the order would entail. These circumstances are notably different than those in *Linear Tech*, because LTC never responded to the foreign distributors' offers to buy until after the critical date. The significance of this second communication is important, but not for the precise reason the district court found. As this court has repeatedly stated, a commercial offer for sale under § 102(b) is "one which the other party *could* make into a binding contract by simple acceptance." *Grp. One Ltd.*, 254 F.3d at 1048; *see also Lacks Indus., Inc. v. McKechnie Vehicle Components, USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003); *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1377 (Fed. Cir. 2002).

Hamilton Beach takes aim at the district court's reliance on the supplier's response email requesting a "release" before it could begin production of the slow cookers. Hamilton Beach points to the parties' corporate purchase agreement which allegedly required Hamilton Beach to give a certified review and approval of a final product to its supplier before shipment of any product. Hamilton Beach consequently argues that, because it did not provide that "release" until after the critical date, there was no binding pre-critical date *contract*, as it says *Linear Tech* requires. Even accepting all of Hamilton Beach's factual contentions as true, they are not determinative of whether the communications with its supplier amounted to a commercial offer for sale.

Hamilton Beach's supplier responded prior to the critical date that it was ready to fulfill the order. In other words, the *supplier* made an *offer* to sell the slow cookers to Hamilton Beach. At that point, the commercial offer for sale was made and, under the governing corporate purchase agreement, Hamilton Beach could accept the

offer when it so pleased. And, Hamilton Beach concedes, as it must, that, had it provided a "release" any time after it received that email, a binding contract would have been formed. *See* Oral Argument at 9:07–13:00, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2013-03-05/all. As such, even if the parties had not entered into a *binding* contract when the supplier responded to the purchase order, the response, nevertheless, was a commercial *offer* for sale that Hamilton Beach could have made into a binding contract by simple acceptance. This was enough to satisfy *Pfaff's* first prong without the need for a binding contract. *Grp. One Ltd.*, 254 F.3d at 1046; *see also Lacks Industries, Inc.*, 322 F.3d at 1348; *Dana Corp.*, 279 F.3d at 1377. To the extent the parties and the district court read *Linear Tech* to require more, they were wrong.[2]

---

[2] The dissent does not dispute that a firm offer for sale occurred in this case or that the offer for sale was for almost 2000 units of the Stay or Go® slow cooker. Instead, it argues that no "commercial" sale occurred because the offer pertained to items that were to be purchased for "experimental use." No experimental use defense has been asserted by Hamilton Beach in this case, however—neither at the trial court level nor before this court. "Experimental use" is simply not at issue. There is, thus, no threat that this decision will have any impact on that defense; it certainly will not "eviscerate" that defense as the dissent fears. Given the dissent's citation to *Pfaff*, it appears that the dissent is confusing the concept of experimental use with whether an invention is ready for patenting at the time a sale or offer for sale occurs. We discuss the ready for patenting prong of the § 102(b) analysis below.

## 2. READY FOR PATENTING

A product is "ready for patenting" for purposes of the on-sale bar under § 102(b) if the claimed invention is: (1) reduced to practice; or (2) depicted in drawings or other descriptions "that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68; *see also Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332–34 (Fed. Cir. 1998) (holding that drawings depicting and samples of the claimed invention were sufficiently definite to enable a person of skill in the art to practice the invention). The district court explained that Hamilton Beach held pre-critical date meetings with many of its retail customers' buying agents and presented detailed descriptions and depictions of the Stay or Go® slow cooker. At these meetings and presentations, Hamilton Beach showed and distributed Computer Aided Design ("CAD") drawings depicting the Stay or Go® slow cooker. The district court found that these detailed drawings and descriptions from Hamilton Beach's meetings, coupled with the communications with its supplier, demonstrated that the invention was ready for patenting.

Hamilton Beach contends that the district court erred in finding that the product that was the subject of the purchase order was ready for patenting because the district court failed to conduct an element-by-element analysis of the precise product that was the subject of the purchase order. Hamilton Beach's argument is misplaced.

First, the Stay or Go® slow cooker is a commercial embodiment of the '928 patent, a fact that Hamilton Beach does not, and cannot, dispute. And, the Stay or Go® slow cooker is the same product that Hamilton Beach both ordered from its foreign supplier and marketed to its retail customers before the critical date. This marketing included presentations that depicted and described the

patentable features of the invention, such as the side clips and lid gasket used to keep the lid in place and seal the food inside.  The district court found as much.

Hamilton Beach argues, however, that the district court was required to do an element-by-element analysis on the prototypes and product samples on which it was working prior to the critical date.  Hamilton Beach contends that such an analysis would show that the samples it marketed, and the specifications upon which it premised its own purchase order, did not meet an important limitation in the asserted claims: that the lid be retained in a "sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container." '928 patent, col. 8, ll. 42–44.  Hamilton Beach alleges that neither its own engineers nor its supplier were able to perfect a slow cooker that met that limitation until "months" after the critical date.

 After review of the district court's analysis and the facts in this record, we perceive no error in the district court's conclusion that the product was ready for patenting prior to the critical date.  Sunbeam proffered what the district court described as a "veritable tome" of evidence from Hamilton Beach's meeting with its retail customers that provided specific descriptions of the Stay or Go® slow cooker, as well as CAD drawings depicting the Stay or Go®, that contained all the limitations of the '831 and '928 patents.  Under the "ready for patenting" prong, so long as the descriptions and depictions of the slow cooker are sufficiently precise to enable a person of ordinary skill to build the invention, the district court properly concluded that the invention was "ready for patenting." *Pfaff*, 525 U.S. at 67–68.

The CAD drawings and descriptions from these presentations—containing the same specifications provided to Hamilton Beach's supplier—are more than enough to enable a person of ordinary skill in the art to practice

the claimed invention. Many of the presentations disclosed that the Stay or Go® slow cooker used clips and a gasket to hold the lid in place. A person of skill in the art, viewing these presentations, would understand that, if the lid is held in place by a gasket, it would be retained in such a way to prevent food from leaking from the container. Given the relative simplicity of the invention, the descriptions and drawings Hamilton Beach showed to its retail customers and the specifications provided to its supplier are sufficiently enabling and, as an admitted commercial embodiment of the patent-in-suit, would meet every limitation of the asserted claims. No reasonable juror could conclude otherwise.

Aside from the drawings and descriptions, Hamilton Beach also concedes that, by February 2005, it possessed at least one product sample that worked as intended, i.e., the lid sealed in such a way to inhibit food from leaking out of the container. *See* Oral Argument at 7:15–8:30. The record reveals that, at about the same time as, and prior to the critical date, Hamilton Beach engineers also created a *working* prototype that was subjected to testing and was successful. In other words, Hamilton Beach possessed working prototypes, or at least one prototype, of the Stay or Go® slow cooker, which it concedes met all the limitations of the asserted patent claims. Hamilton Beach's argument that some of the prototypes did not work as intended is of no moment, moreover, because "fine-tuning" of an invention after the critical date does not mean that the invention was not ready for patenting. *See Weatherchem Corp.*, 163 F.3d at 1332–34. As such, the district court did not err in concluding that the Stay or Go® slow cooker was a commercial embodiment of the asserted claims and necessarily met all the claim limitations, and, consequently, concluding that the slow cooker was ready for patenting.

In sum, the district court's conclusion that there was no genuine dispute of material fact that the patent-in-suit

was invalid under § 102(b) was correct.  Hamilton Beach received a commercial offer for sale from its foreign supplier, and the patented invention was ready for patenting at the time of the sale—as supported by the working prototypes and detailed drawings and descriptions.

### III. CONCLUSION

Based on the foregoing, we affirm the district court's finding that claims 1 and 3–7 of the '928 patent are invalid under 35 U.S.C. § 102(b) because the claimed invention was the subject of a commercial offer for sale prior to the critical date.  Accordingly, we need not reach the other issues addressed by the district court and addressed by the parties in the briefing before this court.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**HAMILTON BEACH BRANDS, INC.,**
*Plaintiff-Appellant,*

**v.**

**SUNBEAM PRODUCTS, INC.**
**(doing business as Jarden Consumer Solutions),**
*Defendant-Appellee.*

---

2012-1581

---

Appeal from the United States District Court for the Eastern District of Virginia in No. 11-CV-0345, Judge James R. Spencer.

---

REYNA, *Circuit Judge*, dissenting.

The Supreme Court has instructed that an on-sale bar under 35 U.S.C. § 102(b) shall arise, if at all, only when the patented invention is the subject of a *commercial* offer for sale and the invention is ready for patenting more than one year before the patent's filing date. *Pfaff v. Wells Elecs.*, 525 U.S. 55, 67 (1998). Yet the majority concludes that Hamilton Beach's purchase order sent to its foreign supplier, which asked the supplier to build a set of slow cookers pursuant to Hamilton Beach's specifications, resulted in an offer to sell a patented invention that anticipates the claims of Hamilton Beach's patent. In order to reach this conclusion, the majority is quick to note that there is no "supplier exception" to otherwise

anticipatory offers for sale under § 102(b), while at the same time it overlooks the Supreme Court's requirement that the offer be a "commercial" one. Because the majority's oversight portends grave consequences for innovation and experimental use, I respectfully *dissent*.[1]

When the Supreme Court decided *Pfaff*, it explicitly rejected this court's multifactor, "totality of the circumstances" test we had previously used to determine whether there was an on-sale bar. 525 U.S. at 66 & n.11; *see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 890 (Fed. Cir. 1999). In its place, the Court substituted a two-pronged test, having a first prong that requires a commercial offer for sale. *Pfaff*, 525 U.S. at 67. This requirement makes sense: "An inventor can both understand and control the timing of the first commercial marketing of his invention." *Id.* Indeed, the Court was careful to distinguish between a "sale [that] was commercial rather than experimental in character." *Id.*; *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 998 (Fed. Cir. 2007) ("Based on [*City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, (1877)], this court has consistently distinguished permitted experimental uses from barred public or commercial uses."). In my view, an overly-broad application of the no-supplier-exception rule would all but abolish this distinction and render the experimental-use exception useless for a significant class of innovators.

After *Pfaff* was decided, this court began fashioning the no-supplier-exception rule in *Brasseler*. The patentee, Brasseler, U.S.A., had its exclusive manufacturer produce 3,000 surgical saws embodying the invention set forth in its patent's claims. *Brasseler*, 182 F.3d at 889. Noting

---

[1] The majority affirmed invalidity on the single issue of on-sale bar. This dissent is limited to its judgment on that issue, which I find to be erroneous.

that the saws were ordered "in large quantity for resale," *id*. at 891, this court concluded that "[t]he transaction at issue undisputedly was a 'sale' in a commercial law sense," *id*. at 890. Indeed, it was "not a case in which an individual inventor takes a design to a fabricator and pays the fabricator for its services in fabricating a few sample products. . . . [Instead, the manufacturer] made a large number of the agreed-upon product for general marketing by Brasseler." *Id*. at 891. Only after concluding that the sale was commercial in nature did this court reject the assertion that the relationship between the supplier and the patentee somehow prevented the sale from triggering the on-sale bar.

Shortly thereafter, in *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353 (Fed. Cir. 2001), this court applied the no-supplier-exception after concluding that the offer was commercial in nature. *Id*. at 1357. The patentee, OEA, Inc., contracted with its supplier to provide it with 20,000 patented embodiments of its "all-glass header" for use in automobile airbags. *Id*. at 1354. In addition, the patentee agreed to supply the supplier with millions of the patented headers annually. *Id*. Unsurprisingly, OEA "conceded that these transactions were 'commercial,' not experimental" given that it was unrebutted that OEA "had purchased [the headers] for commercial purposes." *Id*. at 1355, 1356. Thus, the only two instances where this court has deployed the no-supplier-exception rule involved offers or sales that unquestionably met the Supreme Court's requirement that the offer be part of a "commercial" offer or sale.

With no review of whether the offer was commercial in nature, the majority in this case has extended the no-supplier-exception rule to a case without considering whether the purchase order was placed for purely experimental purposes. Yet the circumstances indicate that it

was.[2] The purchase order "was not the result of customer demand or projections," Appellant's Br. 6 (citing Joint App'x 4975), and, at the time the order was placed, Hamilton Beach was repeatedly changing the product specification due to a series of design failures, most notably, foodstuffs leaking through the lid. The design remained unstable for nearly three months after the purchase order was placed. Just as the Supreme Court applied the experimental-use exception when Mr. Nicholson, the patentee in *City of Elizabeth*, tested and perfected his pavement on a busy toll road in Boston—inspecting and tapping it with his cane almost daily—for more than six years before filing for a patent, 97 U.S. at 133-37, Hamilton Beach was similarly entitled to test and perfect its slow cooker under the experimental-use exception.[3] *See*

---

[2] The majority states that the "experimental use defense has [not] been asserted by Hamilton Beach in this case." Maj. Op. 13 n.2. While Hamilton Beach did not use the phrase "experimental use," it argued at length that its offer for sale was non-commercial and that its engineers were attempting to overcome serious shortcomings when the offer was made. Appellant's Br. 53-57. The majority chooses to ignore the interplay between the requirement for a commercial offer for sale and experimental use. *But see Pfaff*, 525 U.S. at 67. I find that the issues addressed by the parties and, indeed the majority, lay a sufficient framework under which to analyze all the issues in this case.

[3] The majority contends that the use intended by Hamilton Beach in this case was not experimental because it ordered almost 2,000 (actually 1,952) slow cookers. This sort of quantitative analysis was previously accepted under the "totality of the circumstances" test—a test rejected by the Supreme Court in *Pfaff*. Here, Hamilton Beach was not "stockpil[ing] commercial embodiments of their patented invention" as was occurring in *Brasseler*

*Pfaff*, 525 U.S. at 64 ("[A]n inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye."). At the very least, the majority should have identified how the purchase order was commercial in nature when the manufacturing resulted in slow cookers that were incapable of "inhibit[ing] leakage of the food stuffs [sic] from the interior of the container." *But cf.* U.S. Patent No. 7,485,831 col. 8 ll. 50–51 (filed Mar. 1, 2006). If the experimental-use exception is to have any continued vitality, this court must refrain from overlooking the Supreme Court's express requirement for a *commercial* offer for sale when deploying the no-supplier-exception rule.

My greatest concerns involve the implications this case will have for future innovators, most notably small enterprises and individual inventors who lack in-house prototyping and fabricating capabilities. *Cf. Monon Corp.*

---

and *Special Devices. Special Devices*, 270 F.3d 1354. It would make no sense for Hamilton Beach to stockpile slow cookers for future sales when its slow cookers were leaking at the time. Rather, the circumstances suggest that Hamilton Beach was in the midst of testing and perfecting its slow cookers under the experimental use exception when the offer was made. This is true—and can be true—even if the invention was ready for patenting at that time. *See City of Elizabeth*, 97 U.S. at 133; *see also Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1368–70 (Fed. Cir. 2008) (Prost & Dyk, JJ., concurring); *cf. Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379–80 (Fed. Cir. 2005) ("[E]vidence of experimental use may negate either the 'ready for patenting' or 'public use' prong.").

*v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1258–61 (Fed. Cir. 2001) (reversing summary judgment of invalidity and concluding that the sale was non-commercial where the patentee had a third-party test its patented trailer because it lacked in-house testing capabilities). Whenever the development process requires those entities to manufacture working prototypes or pre-mass-production samples, they often have no choice but to reach out to third-party suppliers. Under the majority's holding in this case, a single offer to buy for purely experimental purposes may trigger the on-sale bar, and the experimental-use exception will offer them no salvation. It is from this evisceration of the experimental-use exception that I respectfully *dissent*.